

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

**TAWANA C. MARSHALL, CLERK**
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*[signature]*

**United States Bankruptcy Judge**

**Signed November 06, 2012**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DESPERADO DAIRY, LLC, | § | CASE NO. 12-50354-RLJ-11 |
| | § | |
| DEBTOR. | § | |

### MEMORANDUM OPINION AND ORDER

Hearing was held on October 2, 2012 and October 23, 2012, on the motion of Steven Whitten and Marc Schuil, members of Desperado Dairy, LLC ("Desperado Dairy"), seeking dismissal of its chapter 11 case. The motion was opposed by member Howard Hellman, ostensibly on behalf of Desperado Dairy, as debtor-in-possession, and creditors Darrell Buhr d/b/a Buhr Trucking and S.O.O. Trucking Co.

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law in accordance with the Federal Rules of Bankruptcy Procedure 7052 and 9014.

Upon considering the evidence presented, as well as the pleadings, briefs, and arguments made by counsel for the respective parties, the Court concludes that Desperado Dairy's chapter 11 filing was made without authority and must, therefore, be dismissed.

I.

Desperado Dairy's chapter 11 case was filed on August 13, 2012. The decision to file chapter 11 was made exclusively by Howard Hellman as "Manager" of Desperado Dairy. Hellman was at the time, and still is, a 33.33% owner of Desperado Dairy. The other members—Steven Whitten and Marc Schuil—were not consulted regarding the filing, though Hellman knew at the time that they were opposed to placing Desperado Dairy into a bankruptcy proceeding. As its name suggests, Desperado Dairy is an operating dairy; it was formed in late 2005. Like many dairies, Desperado Dairy has faced tremendous financial difficulties over the past few years. The Court has had several dairy cases before it and has seen first hand the extreme volatility of the dairy industry.

Desperado Dairy's Operating Agreement was amended on August 3, 2011, "to affirm that the Company's operation of a dairy is subject to the financial solvency of such operations, which has been doubtful." Movants' Exh. 7. The company's financial statements reflect that it lost approximately $768,000 in 2006, $311,000 in 2008, $1,776,000 in 2009, $656,000 in 2010, and $245,000 in 2011. The 2007 year is the only year for which a gain is reflected. *See* Debtor's Exhs. 56–61. The Statement of Financial Affairs filed in this bankruptcy case reflects losses of approximately $856,000 in 2010 and $540,000 in 2011. The evidence does not reconcile the Statement of Financial Affairs with the financial statements. Regardless, the dairy has clearly struggled throughout its existence.

The amended Operating Agreement amends section 6.1 of the original Operating Agreement to clarify that all significant decisions concerning the company must be made by a majority of the members. It further provides that Steven Whitten was named as "Manager" of the company. The three members approved and signed the amended Operating Agreement: Steven Whitten with a 51 2/3% interest, Howard Hellman with a 33 1/3% interest, and Marc Schuil with a 15% interest. *See* Movants' Exh. 7. The original Operating Agreement was entered into on December 20, 2005, under which Hellman and Whitten were each 33.33% owners and Schuil and a fourth partner, John Van Ryn, were each 16.66% interest holders. Movants' Exh. 3. Whitten acquired Van Ryn's 16.66% interest in May 2010 for $20,000, plus his (Whitten's) agreement to indemnify Van Ryn for liabilities arising from his ownership in the company. Movants' Exh. 4. In April 2011, Whitten acquired a 1.67% interest from Schuil for the sum of $15,800. Whitten thereby owned a slight majority interest in the company.

The bankruptcy filing was clearly in contravention of the amended Operating Agreement as Hellman did not obtain approval or consent of the majority of the interest holders, Whitten and Schuil.

## II.

Hellman, raising several technical arguments, submits that the amended Operating Agreement should be set aside and thus the original Operating Agreement consulted to determine whether he had authority to file the bankruptcy case. He then contends that, as the sole manager of Desperado Dairy, he had authority to file this bankruptcy as the manager in a "manager managed" limited liability company and, specifically, under the general powers granted the manager under the original Operating Agreement. This requires the Court to conclude that

Hellman, as a one-third owner of the company, had such authority *despite knowing the other members were opposed to a bankruptcy filing*. The provisions of the original Operating Agreement are, at best, ambiguous and contain no specific direction concerning the potential filing of a bankruptcy proceeding. Section 6.1 purports to grant extensive powers to the "Manager" but also refers to decisions of members. Movants' Exh. 3. Section 6.3, which addresses a specific delegation of authority to the Manager, provides that "[s]ubject to such direction as the Members may chose [*sic*] to provide, the Manager shall have responsibility for supervision of the day-to-day business activities and operations of the Company, including all accounting, bookkeeping and financial management required by the Company." *Id*. Section 6.5(b) provides that the Manager may be removed at any time by the members and a successor manager selected by a vote of the members holding a majority interest in the company. *Id*.

     John Van Ryn was named the Manager of the company at the time the LLC was formed. *Id*. He apparently left the company around the time his interest was acquired by Whitten. Hellman was named the "Onsite Manager" at the time of the formation and continued to serve, *on the dairy site*, from the outset. *Id*. To facilitate the approval of a forbearance agreement with the dairy's major lender, Bank of the West, in late June of 2011, Hellman was formally named Manager of Desperado Dairy. (By then it was unclear who had formal authority to sign documents on behalf of Desperado Dairy as Van Ryn had left the scene.)

     Hellman instinctively admitted during his testimony that as manager he could not force the liquidation of the company; such act would require further direction from the other members. The New Mexico Limited Liability Company Act provides for majority consent or vote of members in the analogous circumstance of filing a suit. *See* N.M. Stat. Ann. § 53-19-58 (West 2012)

(incorporating § 53-19-17). It defies a common sense review of the facts and the law to conclude that a one-third owner of a limited liability company has authority to place the company in chapter 11 when he knew at the time that the majority of the members were opposed to such action. *See id*.

Hellman's arguments, and indeed the evidence he presented in support of his arguments, reveal that Whitten, as the wealthiest and also the most financially exposed owner, used his financial muscle to both gain majority control of the company and to force the amendments to the Operating Agreement. In effect, Whitten withheld his consent to further financial accommodations with Bank of the West, the company's major lender, until Hellman agreed to the amended Operating Agreement. In this regard, the Court notes that, in addition to the original capital contributions made by the members, Whitten loaned to the company approximately $1.46 million, Schuil approximately $763,000, and Hellman approximately $122,000.[1] Hellman contends that Whitten, through economic duress, improperly coerced him into signing the amended Operating Agreement. He also contends that Whitten's acquisition of Van Ryn's interest runs afoul of the terms of the Operating Agreement.

Multiple times Hellman acknowledged, at least implicitly, the validity of the amended Operating Agreement and Whitten's acquisition of Van Ryn's interest (thus resulting in Hellman, Whitten, and Schuil as sole members of Desperado Dairy). *See* Movants' Exhs. 5, 6, 8, 9;

---

[1]The Court notes further that on January 30, 2012, the three members (Whitten, Hellman, and Schuil), upon the insistence of Whitten, entered into an agreement providing that any "new money" put in by Whitten from that date forward would be considered "Feed Line" money and would be granted status as "highest priority debt" after the secured creditors Bank of the West, Farm Credit Southwest, and the Small Business Administration. In essence, such agreement placed Whitten in a priority position as to all creditors save for secured creditors. This agreement is troubling. It presumably contravenes New Mexico state law; it also contravenes the Operating Agreement. As a result, the Court will provide a copy of this Memorandum Opinion and Order to the New Mexico Public Regulation Commission–Corporations Bureau.

Movants' Exh. 17 (Desperado Dairy's Statement of Financial Affairs at #21). While Whitten's tactics and actions may provide Hellman with a cause of action against Whitten, they do not cure Hellman's failure of authority.

The evidence reveals that the value of the company's assets may well exceed the claims secured by such assets, potentially creating equity for the benefit of unsecured creditors; the claims of unsecured creditors are significant.[2] Such value would presumably have to be achieved through a reorganization or an orderly liquidation of Desperado Dairy.

### III.

In essence this is a dispute among equity owners in a limited liability company. The company was experiencing severe financial problems throughout its existence, and, in particular, for the two-year period prior to the filing of the case. From April of 2010, when Desperado Dairy's loan with its major lender Bank of the West was placed in "Managed Assets," Hellman and Whitten could not agree on how best to go forward. Whitten continued to make additional loans as the company struggled. Desperado Dairy entered into nine forbearance agreements with Bank of the West. These forbearance agreements typically entailed additional advances made by the bank with additional exposure imposed on the members through their guaranties, especially Whitten. Whitten used his financial leverage to gain control of the company to effect a liquidation of the company on his terms. Though Hellman agreed in principle with a liquidation, he vehemently disagreed with a sale that was proposed by Whitten and Schuil on August 9, 2012. (And based on the bank's position on this hearing, the Court assumes the bank would have

---

[2]For example, Darrell Buhr and S.O.O. Trucking Co. have scheduled unsecured debts of $289,525.20 and $475,281.24, respectively. *See* Debtor's Schedule F [Docket No. 25].

approved the sale.) Such sale provided for a purchase of the dairy's livestock for approximately $3.433 million, coupled with a lease of the dairy facilities. The livestock purchase was at least $1 million less than the stated value of the livestock, however. The sale proposal precipitated Hellman's decision to file the bankruptcy.

Hellman withheld from his own attorneys the amended Operating Agreement which, as stated, required the majority consent of members for essentially any action taken by the company. Even if the Court sustained the filing, the rift among members, with Hellman in a clear minority position, makes a reorganization futile. Hellman did not have sufficient authority to file this chapter 11 case, and cause exists requiring dismissal; this case does not raise the type of "unusual circumstances" sufficient to condone its filing. *See* 11 U.S.C. § 1112(b)(2). It is, therefore,

ORDERED that this chapter 11 case be, and is hereby, dismissed.

### End of Memorandum Opinion and Order ###